## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| VIDA LONGEVITY FUND, LP, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>LINCOLN LIFE & ANNUITY COMPANY OF NEW YORK,<br><br>Defendant. | Civil Action No.:  19-cv-6004<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Vida Longevity Fund, LP ("plaintiff"), on behalf of itself and all others similarly situated, files, for its Complaint against defendant Lincoln Life & Annuity Company of New York ("Lincoln NY"), states as follows:

### NATURE OF THE ACTION

1.     This is a class action brought on behalf of Plaintiff and similarly-situated owners of life insurance policies issued by Lincoln NY or its predecessors-in-interest. Plaintiff seeks to represent a class of Lincoln NY policyholders who have been forced to pay improperly inflated monthly cost of insurance ("COI") charges that are not, as the policies require, determined by Lincoln NY based on its expectations as to future mortality experience.

2.     As a result of these monthly breaches of the policy and the monthly deductions of policyholder funds by Lincoln NY, Plaintiff seeks damages for each monthly and annual breach.

3.     The policies at issue in this case are universal life policies issued on standardized, printed form contracts by Lincoln NY and its predecessors-in-interest. Universal life ("UL") policies combine death benefits with a savings or investment component, often known as the

"account value" or "policy value." A key feature of such policies is the "unbundling" or "transparency" of the various charges and credits. This means that the monthly deductions are broken down into an array of discrete charges and credits: the COI charges, other contractually-specified expenses, and crediting rates.  As the New York Department of Financial Services explains:[1]

> Universal life works by treating separately the three basic elements of the policy: premium, death benefit and cash value. The company credits your premiums to the cash value account. Periodically the company deducts from the cash value account its expenses and the cost of insurance protection, usually described as the mortality deduction charge. The balance of the cash value account accumulates at the interest credited. The company guarantees a minimum interest rate and a maximum mortality charge. Some universal life policies also specify a maximum basis for the expense charge. These guarantees are usually very conservative.

4.      COI charges—also referred to as mortality charges—are intended to compensate the insurer for mortality risk (i.e., the expected probability that the insured will die in a particular policy year). They are generally calculated by multiplying the insurer's net amount at risk (i.e., the death benefit minus the account value) by a COI rate. Those COI rates are flexible, and are prospectively determined by the insurer according to its expectations as to future mortality experience, subject to a table of maximum COI rates that the insurer cannot exceed.  As stated in the Specification Page of the policies at issue:

> Cost of insurance rates are determined by the Company based on its expectations of future mortality experience but such rates will never exceed the guaranteed maximum rates shown in the [policy tables].

5.      As required by Actuarial Standards of Practice and state insurance regulations, Lincoln NY conducts an annual review of mortality assumptions each year.  The Actuarial Standards of Practice, for example, require that insurers like Lincoln NY annually review and

---

[1] *See* https://dfs.ny.gov/consumer/cli_basic.htm (last visited June 26, 2019).

update their mortality expectations to reflect "relevant emerging experience for the purpose of assessing the appropriateness of anticipated mortality." Each year for at least the past several years, Lincoln NY—just like every other life insurance company—has certified that it is has reviewed and updated its expectations as to future mortality experience.

6.      In accordance with the policy language and its regulatory filings, Lincoln NY is then required to determine its COI rates for the following year so that they reflect Lincoln NY's revised and then-current mortality expectations.  But, at least in recent years, Lincoln NY has determined and applied current COI rates to plaintiff's policies that are not based on Lincoln NY's expectations as to future mortality experience. As a result, plaintiff, along with numerous other Lincoln NY policyholders, has been subjected to improper monthly calculations and deductions and forced to pay inflated COI charges that are not allowed by the plain language of their insurance contracts.

7.      It is now well-documented that nationwide mortality expectations have *improved* significantly over the past several decades. The Society of Actuaries and the American Academy of Actuaries periodically publish mortality tables using information collected from America's largest insurers. Those tables show that mortality rates have improved at a rate of roughly 1% per year. Lincoln NY's own regulatory filings confirm that Lincoln NY has benefited from this mortality improvement and that it expects these historical trends to continue into the future. This means that Lincoln NY has recently conducted mortality reviews and, as a result, it expects mortality rates to continue to go down and insureds to live longer. This, in turn, means that Lincoln NY's going-forward cost of providing insurance has decreased. However, Lincoln NY has failed to pass along these savings to policyholders.

8.      In sum, Lincoln NY has violated the terms of the subject policies by failing to base cost of insurance rates on its expectations as to future mortality experience and instead improperly using cost of insurance charges as a way to bolster its profits. As a result of this misconduct, Plaintiff seeks monetary relief for the COI overcharges that Lincoln NY has wrongly imposed and continues to impose on its customers.

## THE PARTIES

9.      Plaintiff Vida Longevity Fund, LP ("Vida"), is a Delaware limited partnership and is the 100% beneficial owner of Lincoln NY policy numbers 7155997 and 7155070 (the "Representative Policies"). The Representative Policies were issued in New York by Lincoln NY on November 26, 2002 ($1.5 million face value) and December 18, 2002 ($1.75 million face value), respectively.  Wells Fargo Bank, N.A., a national banking association ("WF"), serves as the securities intermediary for the Representative Policies under a custodian agreement with Vida, dated as of June 3, 2010.  By written agreement dated February 1, 2019, WF has expressly authorized Vida to pursue this litigation, in Vida's name, and to take any and all actions and exercise any and all rights and remedies that WF would be entitled to pursue in this litigation as the securities intermediary under the governing agreements.

10.      Defendant Lincoln NY is a corporation organized and existing under the laws of New York with its principal place of business in Syracuse, New York.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member  and one Defendant and the aggregate amount of damages exceeds $5,000,000. This action therefore falls within the

original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C §
1332(d).

14. This Court has personal jurisdiction over Lincoln NY because it is incorporated in
New York and has its principal place of business in New York.

13. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c)
because the events giving rise to Plaintiff's cause of action occurred in this District.  Among other
things, both Representative Policies were issued in and delivered in Manhattan, within this District,
as were, upon information and belief, the majority of policies at issue in this case. Lincoln NY is
authorized to issue life insurance solely in the State of New York. Lincoln NY's parent company—
The Lincoln National Life Insurance Company—issues life insurance in the other 49 states.

## FACTUAL BACKGROUND

### A.   The Policies at Issue

14. The policies at issue are all flexible-premium, UL policies issued by Lincoln NY
or its predecessors-in-interest on Single Consideration Policy Forms[2] (the "Subject Policies").
They were all issued on standardized policy forms and insureds are not permitted to negotiate
different terms.

15. UL policies combine death benefits with a savings or investment component, often
known as the "account value" or "policy value." One benefit of UL policies is that they permit

---

[2] A Single Consideration Policy Form is a policy form that states that COI rates will be determined
by the insurer based on expectations of future mortality experience. There are sometimes minor,
yet immaterial, variations in the language used in Single Consideration Policy Forms.  For
example, while the Representative Policies state that COI rates will be "based on [Lincoln NY's]
expectations as to future mortality experience," other Single Consideration Policies may use "of"
instead of "as to," or "expected" instead of "expectations as to," or "based on future mortality
experience expectations."   All policies issued on any Single Consideration Policy Form are
included within the proposed Class.

policyholders flexibility in the amount and timing of premiums necessary to keep the policies in-force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is deducted from the policy value (i.e., the savings component) of the policy on a monthly basis, so the policyholder forfeits the COI charge entirely to Lincoln NY. Any premiums paid in excess of COI charges and other charges are applied to the policy value. These excess premiums earn interest at the credited rate. This structure is beneficial because it allows policyholders the choice to either (i) minimize their capital investment and generate greater rates of return through other investments or (ii) to use the UL policy as a savings vehicle and earn interest on the account value.

16.    The size of the COI charge is highly significant to universal life policyholders. First, it dictates the minimum amount of money that must be paid to keep a policy in force. Second, high COI rates can quickly diminish policy value and reduce the amount of money on which interest can be earned. Absent a secondary guarantee, if the policy value diminishes such that COI charges and certain other specified expenses can no longer be deducted, then the policy will go into grace and, if no additional premiums are paid after adequate time provided by an accurate grace notice, the policy may lapse.

17.    The COI provisions in the Representative Policies are as follows:

**(Policy Specifications)** Cost of insurance rates are determined by the Company ***based on its expectations of future mortality experience*** but such rates will never exceed the guaranteed maximum rates shown in the table on page 7. . . . . .

The monthly cost of insurance rates are based on the sex, attained age (nearest birthday) and Premium Class of the person insured as described under the "Cost of Insurance Rates" provision. . . . .

**(Definition) Cost of Insurance.**    The amount charged by the Company to provide the death benefit coverage under the policy.  This amount is calculated as specified in the "Cost of Insurance" provision.  The cost of insurance is part of the monthly deduction for the policy. . . .

**Cost of Insurance.** The cost of insurance for the Insured is determined on a monthly basis. Such cost is calculated as (1), multiplied by the result of (2) minus (3), where:

> (1)     is the cost of insurance rate as described in the "Cost of Insurance Rates" provision,

> (2)     is the death benefit at the beginning of the policy month, divided by 1.0032737, and

> (3)     is the cash value at the beginning of the policy month prior to the deduction for the monthly cost of insurance, or zero if greater.

**Cost of Insurance Rates.** Monthly cost of insurance rates ***will be determined*** by the Company, ***based on its expectations as to future mortality experience,*** and a portion of such cost of insurance rates may represent a recovery of expenses associated with the administration of the policy; such recovery may be greater in the early policy years. Any change in cost of insurance rates will apply to all individuals of the same class as the Insured. In determining the monthly cost of insurance, the Company will add the amount of the Flat Extra Monthly Insurance Cost, if any, shown in the Policy Specifications.  If the person insured is in a rated premium class, the monthly cost of insurance rates for a standard (non-rated) risk will be multiplied by the Risk Factor, if any, shown in the Policy Specifications. Under no circumstances will the cost of insurance rates ever be greater than those specified in the "Table of Guaranteed Maximum Life Insurance Rates."

(emphasis added).

18.     This policy language provides that the only factor that Lincoln NY can and must consider when determining monthly COI rates is "its expectations as to future mortality experience," and a portion of such COI rates may represent recovery of administrative expenses, but nothing else.

19.     "[E]xpenses associated with the administration of the policy" are internally calculated by the carrier on a per policy basis.  The policy lists an "Administrator Mailing Address" that is separate from the "Home Office Location," and specifies routine administrative tasks that must go through the Administrator, such as: all premiums are payable at the administrator mailing address; the policy is executed at the administrator mailing address; and all writings required by the contract must be sent to the Administrator mailing address, including transfer of ownership forms, change of beneficiary forms, and change in death benefit forms. These administrative

expenses are typically less than $150 per policy per year after issuance. By contrast, Lincoln NY assessed monthly COI charges of $11,238.30 and $6,328.54 on the two Representative Policies in 2018. Insurers, including Lincoln NY, already impose a policy charge to recover administrative expenses, which are capped by the policy.[3]

20.     New York law, 11 CRR-NY 53-3.6, requires Lincoln NY to issue annual reports that disclose "the total amounts that have been credited or debited to the policy value during the current report period, identifying each by type (e.g., interest, mortality, expense and riders)." That means that if a portion of Lincoln NY's COI rates represent a recovery of expenses associated with the administration of the policy, those expenses need to be broken out and identified by type in each annual statement.  Similarly, the policies promise that the Company "will send" an Annual Report "to the Owner at least once a year" that "will show," among other things, "all deductions made since the last report."  Each of the Annual Reports issued by Lincoln NY for the Representative Policies assess a $10.00 "administrative charge" that is separate from the "cost of insurance charge," thereby confirming that the expenses associated with the administration of the policy are *de minimis*.

21.     Lincoln NY imposes other charges and utilizes other mechanisms through which it realizes a profit. First, Lincoln NY profits from the interest spread it earns on policyholders'

---

[3] The Representative Policies state: "The administrative expenses and surrender charges are determined by application of the following: (1) a charge not to exceed 5% of each premium, (2) a $150 policy issue fee and a monthly charge of $10.00 beginning on the Date of Issue, (3) a charge per $1,000 of Initial Specified Amount deducted on the Date of Issue, and a charge per $1,000 of the increase, if any, in Specified Amount deducted on the effective date of the Increase from the table on page 8, (4) the applicable surrender charge (if any) from the table on page 5, and (5) a $25 fee for any partial surrenders (the maximum number of partial surrenders allowed each policy year is 2)."  Each of these are also provided for in table-format in a section entitled "Table of Expense Charges," which further limits the premium charge referenced in (1) above to 2% or under in "years 21 and beyond."

account values (i.e., the difference between interest earned by Lincoln NY on policy accounts and the amount of interest credited to policy accounts). This spread is typically 1% to 2%, which it earns across the aggregate account values for all policies. Lincoln NY had $6 billion in separate account assets as of December 31, 2018. Second, Lincoln NY profits when policies lapse without Lincoln NY ever having paid any death benefit.[4]  Across the industry, approximately 4.2% of life insurance policies lapse each year.  Third, Lincoln NY assesses a surrender charge when a policyholder seeks to exchange his or her policy for the amount in the policy account.  The surrender charge is as high as $64,350 for one Representative Policy, and $74,225 for the other Representative Policy.

22.     The Subject Policies were all issued on Single Consideration Policy Forms: no factor other than expected future mortality experience may be considered, and a portion of such COI rates may represent a recovery of administrative expenses (which, as a factual matter, are *de minimis*).

**B.      Lincoln NY Fails to Reduce COI Rates Despite Continued Mortality Improvement**

23.     A mortality table is a chart showing the rate of death at a certain age. Rate of death can be measured in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. Mortality tables will usually have separate tables for gender. Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status, and duration since underwriting.

---

[4] *See, e.g.,* LAPSE-BASED INSURANCE, Daniel Gottlieb and Kent Smetters (June 6, 2016) (explaining that "life insurance companies earn large profits on clients who terminate their policies" and providing an example of an insurer that priced a policy at a -12.8% profit margin assuming no lapses, but provided a positive 13.6% once a four percent lapse rate was factored in) (available at https://cpb-us-w2.wpmucdn.com/sites.wustl.edu/dist/c/547/files/2016/11/Lapse_Based_Insurance-18n3pv2.pdf).

Mortality tables are used by actuaries to calculate insurance rates and are designed to reflect mortality rate expectations.

24.     Lincoln NY, like all life insurers, documents its expectations of future mortality in the form of a number referred to as a "$q_x$." A "$q_x$" is Lincoln NY's expected probability that the insured for that particular policy will die in that particular year. The term "$q_x$" is an industry standard term for probability of death. For example, if a particular policy has a $q_x$ of .1 in 2017, then Lincoln NY expects that there is a 10% probability that the insured for that policy will die in that year.

25.     That probability or prediction of death changes every year. Lincoln NY updates its $q_x$ every year, first by reviewing its historical mortality experience, that is, the actual deaths experienced in the prior year.  Lincoln NY then adjusts that raw experience to account for its prediction of how future experience will differ to arrive at its then-expected future mortality experience. Those mortality expectations are then used for a variety of purposes, including in the establishment of statutory reserves, GAAP accounting, cash flow projections, and compliance with life insurance illustration regulations.

26.     When Lincoln NY introduced new mortality tables in recent years following an experience study, it would analyze the impact of introducing the new mortality tables on its reserves.  Reserves are the amounts of liquid assets set aside (*i.e.*, "reserved") by the company to cover Lincoln NY policy liabilities.  Up-to-date mortality assumptions impact the amount of reserves that Lincoln NY must set aside for future liabilities.

27.     Mortality expectations are also studied periodically on an industry-wide basis. Beginning at least as early as 1941, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary (CSO) mortality tables. These are industry

standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. CSO tables are also incorporated into I.R.S. regulations to define what constitutes "life insurance," what constitute "reasonable mortality charges," and what is deductible for federal tax purposes.

28.     The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table"). That table was the industry-standard table until 2001. In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) expected mortality rates had improved significantly each year since the 1980 table issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

29.     The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This means the tables are showing a substantial improvement in mortality in a 20-year time period. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

30.     Since the 2001 CSO Mortality Table was introduced, the SOA has continued to conduct surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. These surveys have consistently showed

mortality improvements over the last three decades, particularly for ages 70-90. For example, the SOA published Individual Life Experience Reports for the periods 2002-2004; 2005-2007 and 2008-2009 each noting strong rates of improvement in mortality. Periodically the SOA will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include: (a) 1990-95 Basic Select and Ultimate Mortality Tables; (b) 2001 Valuation Basic Mortality Table, (c) 2008 Valuation Basic Table, and (d) 2015 Valuation Basic Table. Each of these updates confirms that mortality had continued to significantly improve from the 2001 CSO Table. Other surveys have also noted mortality improvements. In May 2013, for example, the reinsurance company RGA published a report sponsored by the SOA enumerating mortality rates and mortality improvements at older ages, which showed material rates of mortality improvements.  These improvements have resulted in lower costs to insurers, which, pursuant to the policy language, should be passed on to policyholders through lower cost of insurance charges.

31.     Both Lincoln NY and its parent company have recently acknowledged that, consistent with industry experience, its expectations as to future mortality experience have improved. Each year, insurers are required to file annual interrogatory statements with the NAIC. These are sworn statements that are certified and signed by an actuary. The interrogatories include questions regarding the setting of non-guaranteed elements (which include COI rates) and whether expectations have changed. For example, Question 4 asks: "Are the anticipated experience factors underlying any nonguaranteed elements [e.g., COI rates] different from current experience?" In its 2013 and 2014 filings, Lincoln NY stated: "Yes….Mortality experience is also predicted to improve in the future."  Lincoln's subsequent filings have not indicated any adverse change in its future mortality expectations.

32.     Lincoln NY has therefore acknowledged that it has experienced a trend of improved mortality and admits that it expects this trend to continue.

33.     Despite this dramatic improvement in both mortality experience and expectations of future mortality experience, Lincoln NY has not calibrated its COI rates based on its updated expectations as to future mortality experience, as required by the policy language.  Rather, Lincoln NY has, over the past six years, kept the same COI rate scale in place despite dramatically reduced expectations of future mortality costs.

34.     In 2015, Lincoln NY announced that it was raising COI rates on a block of policies administered by it by as much as 45%, and justified the increase by pointing to low interest rates and higher reinsurance costs (despite improved mortality). So Lincoln NY has not hesitated to increase COI rates when it felt that it could justify such conduct pursuant to the policy language. But for policies issued on Single Consideration Policy Forms, Lincoln NY has ignored the policy language and kept its COI rates at inflated levels. The Subject Policies do not allow Lincoln to take such a "heads I win, tails you lose" approach—increasing COI rates when experience factors allegedly deteriorate but holding COI rates constant when experience factors improve.  Rather, the policies require, on a prospective basis, COI rates to be determined based on expectations of future mortality experience.[5]  Lincoln NY has failed to do so, in express breach of the policy language.

35.     Lincoln NY has also actively concealed its wrongdoing: the monthly COI rates used to calculate COI charges are not disclosed to policyholders, nor are Lincoln NY's mortality

---

[5] Lincoln NY's *de minimis* internal "expenses associated with the administration of the policy" does not and could not possibly offset the mortality gains that Lincoln NY has experienced in recent years, particularly when those administrative expenses are, as the policies themselves indicate, higher in early years and lower in later years.  The policies at issue in this case were all issued over a decade ago.

expectations and actuarial assumptions. And while experienced insurance experts may be able to access Lincoln NY's regulatory filings, those filings also do not itemize or reveal COI rates or Lincoln NY's current mortality expectations, and accessing them requires registration and payment of a fee, as well as interpretation by an experienced life insurance expert.[6] Accordingly, it would be impossible for policyholders to know what Lincoln NY's internal mortality expectations are without inside access to Lincoln NY's $q_x$ files and annual mortality reviews, which Lincoln NY treats as strictly confidential and exempt from public disclosure.

## **CLASS ACTION ALLEGATIONS**

36.     This action is brought by Plaintiff individually and on behalf of a class pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure. The class—referred to as the "COI Overcharge Class"—consists of:

> All current and former owners of universal life (including variable universal life) insurance policies issued by The Lincoln Life & Annuity Company of New York and its predecessors in interest that were in force at any time on or after June 27, 2013 that provide for (a) an insurance or cost of insurance charge or deduction calculated using a rate based on expectations as to future mortality experience, (b) additional but separate policy charges, deductions, or expenses, (c) an investment, interest bearing, or savings component, and (d) a death benefit.

The COI Overcharge Class does not include defendant Lincoln NY, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

37.     Plaintiff also seeks to represent a subclass—referred to as the "New York Subclass"—that consists of:

> All members of the COI Overcharge Class whose life insurance policies were issued in the State of New York.

---

[6] In addition, not all regulatory filings are public. For example, Lincoln NY specifically requests each year that its Actuarial Reports and related profit tests be treated confidentially by regulators and remain exempt from disclosure pursuant to state and federal freedom of information laws.

The New York Subclass does not include defendant Lincoln NY, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.

38.     Both the COI Overcharge Class and the New York Subclass consist of hundreds of consumers of life insurance and are thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by Lincoln NY.

39.     The claims asserted by Plaintiff are typical of the claims of COI Overcharge Class and the New York Subclass. Plaintiff will fairly and adequately protect the interests of the COI Overcharge Class and the New York Subclass and does not have any interests antagonistic to those of the other members of the classes.

40.     Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters and COI matters, as well as class and complex litigation.

41.     Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

42.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the COI Overcharge Class and the New York Subclass predominate over any individualized issues. Those common questions that predominate include:

(a)     the construction and interpretation of the form insurance policies at issue in this litigation;

(b)     whether Lincoln NY's actions in failing to determine and charge monthly COI rates according to its expectations of future mortality on the COI Overcharge Class and the New York Subclass violated the terms of those form policies;

(c)      whether Lincoln NY is basing its current COI rates on its expectations as to future mortality experience;

(d)      whether Lincoln NY breached its contracts with Plaintiff and members of the COI Overcharge Class and the New York Subclass;

(f)      whether Lincoln NY's expectations as to future mortality experience have improved; and

(g)      whether Plaintiff and members of the COI Overcharge Class and the New York Subclass are entitled to receive damages as a result of the unlawful conduct by Lincoln NY as alleged herein and the methodology for calculating those damages.

43.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)      the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress individually for the wrongs that Lincoln NY committed against them;

(b)      when Lincoln NY's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)      this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)      without a class action, many class members would continue to suffer injury, and Lincoln NY's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e)      this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

44.     Plaintiff realleges and incorporates herein the allegations of the paragraphs above of this complaint as if fully set forth herein. This claim is brought on behalf of Plaintiff and the COI Overcharge Class and the New York Subclass.

45.     The Subject Policies are binding and enforceable contracts. The contracts at issue obligate a determination of the COI monthly, and at least each calendar year. The failure to adjust the charged rates on the policies to reflect current mortality expectations each year represents a discrete contractual breach.

46.     Lincoln NY breached its contracts, including the covenant of good faith and fair dealing, with Plaintiff, the COI Overcharge Class, and the New York Subclass by failing to determine COI rates based on expected future mortality experience and deducting COI charges calculated based on those unlawful rates. Plaintiff's and each of the classes' damages include, but are not limited to, the excess COI charges that Lincoln NY deducted by not reducing COI rates based on improved expectations of future mortality experience.

47.     Plaintiff and the members of the COI Overcharge Class, and the New York Subclass have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Lincoln NY's conduct as set forth herein.

48.     As a direct and proximate cause of Lincoln NY's material breaches of the policies, Plaintiff, the COI Overcharge Class, and the New York Subclass have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the COI Overcharge Class, and the New York Subclass pray for judgment as follows:

1.      Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding Plaintiff, the COI Overcharge Class, and the New York Subclass compensatory damages;

3.      Awarding Plaintiff, the COI Overcharge Class, and the New York Subclass pre-judgment and post-judgment interest, as well as costs; and

4.      Awarding Plaintiff and classes such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated:  June 27, 2019                     Respectfully submitted,

                                          *s/ Seth Ard*
                                          Seth Ard (SA1817)
                                          Ryan C. Kirkpatrick (*pro hac vice* to be filed)
                                          Nick Carullo
                                          SUSMAN GODFREY L.L.P.
                                          1301 Avenue of the Americas, 32nd Floor
                                          New York, NY 10019
                                          Tel.:   212-336-8330
                                          Fax:    212-336-8340
                                          sard@susmangodfrey.com
                                          rkirkpatrick@susmangodfrey.com
                                          ncarullo@susmangodfrey.com

                                          Steven G. Sklaver
                                          (*pro hac vice* to be filed)
                                          Glenn C. Bridgman
                                          (*pro hac vice* to be filed)
                                          SUSMAN GODFREY L.L.P.
                                          1900 Avenue of the Stars, Suite 1400
                                          Los Angeles, CA 90067-6029
                                          Tel:    310-789-3100
                                          Fax:    310-789-3150
                                          ssklaver@susmangodfrey.com
                                          gbridgman@susmangodfrey.com

                                          *Attorneys for Plaintiff*